MATTER OF B——

In SECTION 245 Proceedings

A-11589013

*Decided by Regional Commissioner March 28, 1960*
*Approved by Assistant Commissioner*

Adjustment of status—Section 245 of 1952 act—Not available to crewman whose actions indicate he was not *bona fide* nonimmigrant at time of admission.

(1) Section 245 applicant has not met burden of establishing that he was a *bona fide* crewman at time of last admission when the record shows that he was refused permission for discharge by the master of his vessel; that he proceeded from New Orleans to New York to become better acquainted with a United States citizen whom he had met before and to whom he was actually married three days after his arrival there.

(2) Applicant's testimony regarding his intentions at time of entry (to depart with his ship or secure a berth on another vessel) is not accepted when viewed against his actions before and after arrival and his admitted untruthfulness in sworn statement made to the Service. (*Matter of M——*, A-10256535, Int. Dec. No. 990, distinguished.)

### BEFORE THE REGIONAL COMMISSIONER

**Discussion:** This case is before me by certification under 8 CFR 103.4. The district director has denied the application on the ground that the applicant was not a *bona fide* nonimmigrant at the time of his last admission into the United States.

The applicant is a native and citizen of Greece, age 28, who was last admitted to the United States at Galveston, Texas, on February 17, 1959, as a nonimmigrant crewman under section 252(a)(1) of the Immigrant and Nationality Act solely for the length of time his vessel was to remain in United States ports (not to exceed twenty-nine days).

The SS. *HELEN H.* upon which the applicant arrived proceeded coastwise from Galveston to New Orleans, Louisiana, arriving there on February 24, 1959. On March 10, 1959, the SS. *HELEN H.* sailed foreign from New Orleans. The applicant and 6 other crew members were reported by the master of the vessel as deserters. The applicant has remained in the United States continuously since his entry at Galveston on February 17, 1959.

On April 23, 1959, the applicant walked into the New York office and filed the application which is now before us. At the time of

filing, he claimed nonquota status under section 101(a)(27)(A) of the Immigration and Nationality Act based on his marriage to a United States citizen. Subsequent to filing, the applicant has been interviewed under oath on two different occasions.

The record shows the applicant was first interviewed by an immigrant inspector June 11, 1959, at which time he testified, in essence, as follows: That he left the SS. *HELEN H.* on February 24, 1959, and flew to New York registering at the Hotel Rio. He then made inquiry at the Ocean Restaurant as to the location of a cousin whom he intended to visit for 3 days. While at the restaurant he was introduced for the first time to his present wife and on the following day proposed marriage. He had been informed by acquaintances 4 or 5 months before arriving that he could marry a United States citizen and remain in the United States. His second cousin, owner of the Ocean Restaurant, whose name he had forgotten, introduced him to the girl whom he married three days later. He further testified that he had no intention of marrying at the time that he left the vessel on February 24, 1959, and, in fact, intended to return to the ship scheduled to sail between the end of February and the 5th of March. In reply to further questioning, he amended this statement to say that he planned to seek a new ship in New York or would have returned to the SS. *HELEN H.* if unable to obtain a new berth in New York. In support of his application, a marriage certificate was presented showing the marriage of the applicant to C——C—— on February 27, 1959, at New York.

Because of the improbability and contradictions apparent in the applicant's testimony, arrangements were made for his wife to be interviewed.

On July 28, 1959, the applicant and his wife were interviewed under oath by an investigator of this Service. He testified that many of the statements made in the prior interview were untrue and that he did not tell the truth because he was upset, nervous and confused. On this occasion he testified he first met his present wife in November of 1958 and corresponded with her until his return in February 1959. The subject of marriage was a topic of correspondence, and in order to become better acquainted, he left the ship on February 24 for a short visit. To support the statements regarding the exchange of correspondence, he presented a radiogram dated November 26, 1958, extending Thanksgiving greetings from "C——", and a letter in the Greek language dated January 2, 1959, from the applicant to his wife in which he stated the following:

May my letter find you well, and the New Year give you everything you desire. I received your Christmas cable, and card and letter for the New Year. I was overjoyed, pleased, and touched by your noble expressions. I wanted to call you up upon arriving at port but had to wait in the outer

harbor until our turn came * * * felt overjoyed at the wonderful words in your letter and that you are looking forward to meeting each other. I felt indeed distressed leaving so soon after we first met, even though that meeting was enough to make me appreciate and like you and I felt I knew you for many years before. There is nothing left for me to do but bring myself near to you as soon as I leave the ship. I hope you form the right opinion about me for I am a very worthy person like you are. After unloading and sailing for America, I'll get you on the wire and talk about my leaving the ship. Give Mrs. T—— warmest regards.

At the time of the above interview, the applicant's spouse was also questioned under oath regarding the circumstances of her marriage. She testified that she first met the applicant in November 1958, and that subsequent thereto corresponded with him; that on February 24, 1959, the applicant telephoned her to advise that he was coming to New York and wanted to know her better. She stated that when he arrived in New York that she knew that she loved him because she had grown to love him by his letters and that when he proposed marriage, she immediately accepted. She testified that it was her true belief that the marriage was solely for love and that the applicant has been a good husband.

Section 245 under which the applicant is applying for adjustment of status reads, in part, as follows:

SEC. 245. (a) The status of an alien who was admitted to the United States as a bona fide nonimmigrant may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, (3) an immigrant visa was immediately available to him at the time of his application, and (4) an immigrant visa is immediately available to him at the time his application is approved. * * *

Section 252(a)(1) under which the applicant was admitted as a nonimmigrant crewman reads as follows:

SEC. 252. (a) No alien crewman shall be permitted to land temporarily in the United States except as provided in this section, section 212(d)(3), section 212(d)(5), and section 253. If an immigration officer finds upon examination that an alien crewman is a nonimmigrant under paragraph (15)(D) of section 101(a) and is otherwise admissible and has agreed to accept such permit, he may, in his discretion, grant the crewman a conditional permit to land temporarily pursuant to regulations prescribed by the Attorney General, subject to revocation in subsequent proceedings as provided in subsection (b), and for a period of time, in any event, not to exceed—

(1) the period of time (not exceeding twenty-nine days) during which the vessel or aircraft on which he arrived remains in port, if the immigration officer is satisfied that the crewman intends to depart on the vessel or aircraft on which he arrived. * * *

The definition of a crewman is found in section 101(a)(15)(D), as follows:

Sec. 101. (a) As used in this Act— * * *

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens— * * *

(D) an alien crewman serving in good faith as such in any capacity required for normal operation and service on board a vessel (other than a fishing vessel having its home port or an operating base in the United States) or aircraft, who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the United States with the vessel or aircraft on which he arrived or some other vessel or aircraft. * * *

The wording of section 245 clearly demands an examination of all applicants for adjustment as to whether they were, in fact, *bona fide* nonimmigrants at the time of their admission to the United States, particularly in cases of recent arrivals. The burden is upon the applicant, not the Government, to establish *bona fides* of nonimmigrant status at the time of admission. This burden is not met solely by the gratuitous or self-serving statements of the applicant as to his intent at the time of admission. The Government has the responsibility to weigh all evidential factors present in each case carefully and considerately. Such factors include the actions of the applicant prior and subsequent to arrival.

In the instant case, we have carefully weighed the actions of the applicant in the light of the sworn testimony. He was admittedly untruthful in his initial testimony before an officer of this Service regarding his intentions at the time of his admission to the United States and as to his reasons for leaving his vessel. In view of this, considerable doubt is cast upon his amended testimony regarding his intentions at the time of entry. Here we have an alien who admittedly planned to depart from his vessel to marry a woman whom he had met before if she would have him. He, in fact, asked permission from the master of his vessel to discharge from the vessel on which he arrived but the permission was refused. He actually carried out his preconceived plan by departing from his vessel from New Orleans to New York and married within three days after arriving there. He would have us believe that he intended to depart with the vessel on which he arrived or by securing a berth on another vessel. He did neither. He remained in the United States. Credibility cannot be accorded his testimony in light of his actions prior to and subsequent to his arrival.

The facts in this case are distinguished from prior cases in which we have found a crewman to be a *bona fide* nonimmigrant. In *Matter of M——*, A–10256535, Int. Dec. No. 990, for example, the applicant was last admitted as a crewman in 1948. Clearly his intention at time of entry was to reship foreign. However, because of unforeseen circumstances he was forced to remain in the United States a prolonged period of time during which a change occurred in his intention to resume his calling.

The instant case is not that of a crewman who, through unforeseen circumstances beyond his control, such as illness and/or hospitalization, was prevented from departing with his vessel and had to remain in the United States a prolonged period of time. We must conclude that the applicant failed to sustain the burden of establishing that he was a *bona fide* crewman at the time of his last admission. Accordingly, the application will be denied.

**Order:** It is ordered the application be denied.